After an anxious consideration of this case, my opinion is that some improper testimony has been received, and that a new trial ought to be awarded. It will be admitted that the proper object of evidence is to ascertain the truth of the fact put in issue, and that evidence admitted on any point not put in issue has a tendency to surprise the accused, or to affect his conviction by the force of prejudice. The rule of rejecting all manner of evidence in criminal prosecutions (says Justice Foster) that is foreign to the point in issue is founded on sense and common justice. For no man is bound, at the peril of life or liberty, fortune or (263) reputation, to answer at once and unprepared for every action of his life. Few even of the best of men would choose to be put to it. Our Bill of Rights has endeavored to guard against the mischief by providing that in criminal prosecutions every man has a right to be informed of the accusation against him, and to confront the accusers and witnesses with other testimony. The latter part of the privilege is unavailing and delusive, unless the first be distinctly observed. The charge against the prisoner here is uttering a forged bank note, knowing it to be forged; the essence of the crime consists in the knowledge of the accused, without which the act of uttering a forged bill is innocent, and I admit fully that any proof which tends directly to prove this knowledge is proper, although it should involve other crimes committed by the defendant. This is the extent to which the two cases have gone which were cited on the part of the State; it was proved in both that the prisoners had recently, before the last offense, uttered counterfeit notes of the same bank, or had the same
money in possession. But the particular offense in this case consists in uttering a note altered from a five to a fifty, I suppose by some chemical process; and as this is an act requiring a kind of skill peculiar to itself, it may be possessed by one who knows nothing of the art of making counterfeit notes. And a person thoroughly versed in making them may still be altogether ignorant of this mode of alteration. If a knowledge of the one does not necessarily imply a knowledge of the other, it cannot be relevant testimony in the case; but still it must powerfully tend to a prisoner's conviction when it is proved that he has for twenty years and more been concerned in making and handling counterfeit notes, and that he is a person of evil dispositions and wicked habits. The most upright jury, sitting upon the trial of a prisoner whose criminal conduct is thus exhibited to *Page 151 
them in various shapes and degrees, will find their indignant (264) feelings too strongly excited to keep steadily in view the true point of investigation. Instead of traveling calmly to a conclusion through a patient consideration of the evidence, they will be too apt to be precipitated into a conviction of his guilt, from the probability that a man who has committed other crimes has also done this. The issue of this may sometimes be the punishment of guilt, but is there not danger that it may also lead to the conviction of the innocent since circumstances of strong presumption may be adduced against them which they could have explained had they been apprised of their coming forward? Hence the law will not allow it to be proved on the trial of an indictment that the prisoner has a general disposition to commit the same kind of offense as that charged against him, or that he had committed a similar offense at another time. 1 Phillips' Ev., 137. Yet such proof would create a stronger presumption of guilt, as part of the evidence adduced in this case would, without being connected as it ought to be with the particular fact on trial. So, in a trial for high treason where the overt act laid was that the defendant had cruised in a certain vessel, proof was rejected that he had gone cruising in another, for the fact charged was the only one he was then called to answer for. Foster, 246. Yet the proof rejected went to show a treasonable disposition and a familiarity with the crime. The law will not allow evidence of a prisoner's bad character to be adduced against him in chief, left his case should be thereby prejudiced and converted into a trial for character instead of a special crime. But if evidence of general character is thus excluded because it is dangerous, how much more so is the evidence of particular crimes and propensities extending through a great portion of the prisoner's life? It cannot in reason be expected that he is prepared for such a trial, for he has not notice of it, and the evidence must go to the jury with full weight of the odium thus created. Circumstances may be brought forward in (265) the life of the most upright man, which, if taken singly and unexplained, are calculated to raise a presumption against him, but which upon a nearer view might more clearly show his innocence. I will briefly notice those parts of the evidence which I think improper because they do not warrant directly the inference that Twitty passed this bill knowing it to be counterfeit, though it must be admitted that the evidence cannot be read without leaving a strong impression on the mind unfavorable to his character. His knowledge of the genuine three dollar notes of the Cape Fear Bank; his having in his possession twenty years ago a quantity of untrimmed counterfeit notes, which *Page 152 
he said were well executed; the proof that he was a maker of spurious money and intimate with persons of the same description, are circumstances from none of which can I see a direct or necessary inference that Twitty was acquainted with the particular mode of altering notes which appears in this case; a mode which seems to be of modern invention, and which a person skilled in could probably follow to the exclusion of the greater labor and risk of fabricating bank notes and forging the signatures. I feel perhaps more strongly convinced of the impropriety of this evidence, because, after a consideration of the whole case, I think the probability is on the side of Twitty's innocence in this charge. It appears to me that he has been particularly cautious in respect to passing counterfeit money; that he has rather contrived the movements and directed the greater operations of a larger concern then encountered the dangerous details of guilt. His reflection upon the value of his counterfeit stock in the hands of a young man of good character implies that his own was suspected, and that he could not safely utter the money; and in no part of the evidence against (266) him does it appear that he had ever passed money of the description here charged. Now it strikes me as improbable, and by no means reconcilable with his former conduct, that he should venture upon the dangerous experiment of sending this counterfeit note to a man who, of all others, was most likely to detect it, the cashier of a bank, daily in the habit of receiving and judging of money, and who was not likely to lose any part of his skill and quicksightedness in detecting false money sent to him by Twitty. I should therefore be of opinion, for these reasons, that the defendant's is entitled to a new trial. Upon the motion in arrest. I will not enter into a particular examination, because I fully agree with my brothers that the affidavit on which the case was removed was wholly insufficient, according to the act of Assembly.
PER CURIAM. Error.
Cited: S. v. Seaborn, 15 N.C. 313, 320; S. v. Barfield, 30 N.C. 352;S. v. Hill, 72 N.C. 350; Phillips v. Lentz., 83 N.C. 243. *Page 153 
(269)
IN EQUITY